**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WATERLOO DIVISION**

PATRICIA M. MARVETS,

       Plaintiff,

vs.

LINDA S. McMAHON,[1] Commissioner
of Social Security,

       Defendant.

No. C06-2024

**ORDER**

_____

I. PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A. Relevant Medical History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B. Plaintiff's Subjective Complaints . . . . . . . . . . . . . . . . . . . . . . . . 11
    C. Competing RFCs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    D. Hearing Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III. CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    A. Scope of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    B. ALJ's Disability Determination . . . . . . . . . . . . . . . . . . . . . . . . . 24
    C. Residual Functional Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        1. Treating Physician . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        2. Obesity Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
        3. Credibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        4. Improper Hypothetical Question . . . . . . . . . . . . . . . . . . . . . . . 32

This matter comes before the court pursuant to briefs on the merits of this

application for disability insurance benefits. On May 26, 2006 the parties consented this

----

[1] As of January 22, 2007, Linda S. McMahon became Acting Commissioner of Social Security. She should be substituted as the defendant on further orders in all pending Social Security cases. See FED. R. CIV. P. 29(d)(1).

matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 5).  The final decision of the Commissioner of Social Security is affirmed.

## I.  PROCEDURAL BACKGROUND

Plaintiff Patricia Marvets (hereinafter "Marvets") filed an application for Disability Insurance Benefits and Supplemental Security Income benefits on February 27, 2002 alleging an inability to work since December 26, 2001 (Tr. 111-13, 450-62).  The Social Security Administration (hereinafter "SSA") denied Marvets' application initially and upon reconsideration (Tr. 95, 102).  Administrative Law Judge (ALJ) John P. Johnson held a hearing regarding Marvets' appeal on August 18, 2004 (Tr. 39).  The ALJ denied her appeal on November 26, 2004 (Tr. 14).  The Appeals Council further denied Marvets' request for review on February 22, 2006 (Tr. 9).  Marvets filed this action for judicial review on April 6, 2006 (docket number 3).

## II.  FACTUAL BACKGROUND

At the time of the hearing, Marvets was 54 years old.  She completed high school equivalency.  Her vocationally relevant past work experience includes work as a shaving hauler[2] and home care.  Marvets alleges disability since December 26, 2001.  The ALJ determined that she had the following severe impairments:

> degenerative disc and joint disease in the lumbar spine; a left knee disorder, status post arthroscopy with partial medial menisectomy and lateral tibial condial abrasion chrondoplasty in February 2004; is obese at 65" tall with a weight of approximately 258 pounds; has chronic obstructive pulmonary disease; gastric problems; history of carpal tunnel surgery and trigger thumb surgery and recent tendonitis of the right upper extremity; history of transient ischemic attacks, [and] adjustment disorder with mixed anxiety and depression.

(Tr. 18).

---

[2]  According to Marvets, as a shaving hauler she shoveled casts and irons for 8-12 hours a day for John Deere.

## A. Relevant Medical History

On May 2, 2000 Dr. Mutchler saw Marvets for obesity and elevated blood pressure (Tr. 280). He noted that she "has been riding on an exercise bike and trying to lose weight but is unable to lose any weight." (Tr. 280). On October 9, 2000 Dr. Mutchler noted that MarMarvets was having "shortness of breath at times." (Tr. 278). He advised her to quit smoking and prescribed medication and an inhaler (Tr. 278).

On October 26, 2000 Dr. Victor Lawrinenko saw Marvets as a referral from Dr. Bryant Mutchler regarding right upper quadrant abdominal pain and LFT abnormalities (Tr. 269). October 27, 2000 Dr. Lawrinenko performed an upper endoscopy with biopsies to check for erosive esophagitis, Barrett's esophagus and peptic ulcer disease (Tr. 272). He found Grade 1 non-erosive esophagitis, short segment Barrett's esophagus (possible) with biopsies, and non-erosive gastritis (Tr. 272). Dr. Lawrinenko prescribed medication, gave precautions regarding reflux, and scheduled a follow-up (Tr. 273).

On February 6, 2001 Dr. Mutchler saw Marvets for fatigue, weight gain, hair loss, and hyperlipidemia.[3] He prescribed Lipitor and scheduled a follow-up appointment (Tr. 266). On October 13, 2002 nutritionist Teresa Boring met with Marvets "secondary to elevated cholesterol." (Tr. 225). Ms. Boring recommended an 1800 calorie diet with a 1-2 lb. weight loss goal per week (Tr. 225). She gave Marvets other recommendations regarding label reading, carbohydrate counting, and fiber consumption (Tr. 225). No follow-up was planned, although Ms. Boring encouraged Marvets to contact her with questions or concerns (Tr. 225).

On December 17, 2001 Dr. Mutchler performed a work physical for Marvets (Tr. 263). Generally, he found Marvets "in no acute distress, alert, and oriented three times." (Tr. 263). Dr. Mutchler performed a musculoskeletal exam in which he noted that Marvets "reveals five over five strength in all extremities and no muscular atrophy in the

---

[3] High cholesterol.

arms, legs, or back muscles . . . [Her] extremities show full range of motion, and no peripheral edema is noted . . . [Her] gait and station is normal with good weight-bearing, and no ataxia or footdrop on ambulation." (Tr. 263). On December 27, 2001 Marvets saw Dr. Mutchler for right knee strain and pain (Tr. 261). He noted that her knee was swollen, tender, and painful and ordered an X-ray and orthopedic consult (Tr. 261). The X-ray turned up negative (Tr. 262).

On January 11, 2002 Dr. Mutchler saw Marvets for chronic low back pain, weakness and numbness running down her legs and foot, and foot drop (Tr. 259). He ordered a lumber spine cat scan and ordered her to stop working as "[h]er work involves a lot of bending, lifting and doing personal care for clients." (Tr. 259). On January 14, 2002 Dr. Mutchler performed a cat scan on Marvets (Tr. 216). The cat scan showed

> Mild central canal stenosis is present at the L4 interspace level. The stenosis is due to a diffusely bulging annulus and posterior ligamentous and facet hypertrophy.
> Unilateral right sided spondylosis at the L5 level. Increased density is seen in the left pars from the increased stress from the right sided pars break.
> Mild bulging of the L2 and L3 annuli without significant stenosis at these levels. No disc herniations visible.

(Tr. 216). Dr. Mutchler performed a lumbar X-ray due to Marvets' low back pain and because both of her legs went numb frequently (Tr. 217). The report indicated "[m]ild hypertrophic change lumbar spine. Otherwise negative." (Tr. 217).

On February 12, 2002 Marvets underwent a PA and lateral chest films to evaluate her emphysema (Tr. 395). Dr. Dan Mulholland found "[n]o acute chest disease" and instead "[w]hat appears to be some old granulomatous disease." (Tr. 395). On March 11, 2002 D.D.S. physician Dr. Roswell Johnston evaluated Marvets for chronic low back pain and once for knee complaints (Tr. 218). Dr. Johnston did not find either to establish significant disability (Tr. 218). According to his examination,

> I am unable to elicit Achilles or patella reflexes on either side. She has Grade 5EHL ankle dorsiflexion and quad strength. Good supple motion of the hips. She has excellent flexibility

> with no tightness of the hamstrings. She tolerates straight leg
> raise to 90 degrees on each side. She can heel and toe walk
> satisfactorily. She can easily forward flex at the waist. She
> fails to flex her knees coming to the upright position. She
> localizes her tenderness in the small of her back at the
> lumbosacral region, also to the buttock region.

(Tr. 220). Dr. Johnston noted that he reviewed "the importance of [Marvets] avoiding the partially forward flexed position [and] the importance of flexing her knees." (Tr. 221).

He recommended that she "avoid any lifting or straining below knee height level" and that she might benefit from an epidural (Tr. 221). Regarding her knee pain, Dr. Johnston noted that she suffered a contusion which caused some numbness, but no significant pain (Tr. 222-223).

From April 5, 2002 through June 5, 2002 Marvets saw Advanced Registered Nurse Practioner (hereinafter "ARNP") Sara Douglas for various ailments, including a cough, hives, and gynecological issues (Tr. 226-236). Throughout the treatment notes, MarMarvets also repeatedly complained of chronic low back pain.

On May 22, 2002 ARNP Douglas noted Marvets' chronic back pain and MarMarvets also indicated that "her legs get jumpy at night and sometimes during the day and they cramp a lot." (Tr. 229). ARNP Douglas indicated that she would refer her to an orthopedics specialist regarding her back pain and otherwise advised that she continue to use hot packs and ice on her back (Tr. 229). On July 31, 2002 Dr. Geoffrey Haft evaluated Marvets upon ARNP Douglas' referral for "evaluation of chronic low back pain and numbness radiating down both thighs anteriorly." (Tr. 247-251). Dr. Mendoza indicated,

> Patient states that the vast majority of her pain is in her back
> and not in her legs. This is bothersome at all times and all
> positions. Neither walking or standing makes it worse than
> sitting or lying. Patient states that her walking is limited by
> pain in her back and some degree by the pain in her legs. She
> is currently able to walk less than 1 block. Two years ago she
> thinks that she could have walked a quarter of a mile. Patient
> does not get any kind of exercise or physical activity on a

> regular basis.  She has a history of emphysema and continues
> to smoke 1 pack of tobacco per day.

(Tr. 247).  Regarding pain severity, Marvets indicated that the severity is a "10," with continuous back pain (Tr. 247).  She described her right leg pain as existing "most of the time, extremely bothersome, numbness and tingling some of the time, very bothersome, weakness a good bit of the time, and weakness very bothersome." (Tr. 247).  Her left leg hurt "some of the time, somewhat bothersome, numbness and tingling some of the time, very bothersome, weakness most of the time, and weakness very bothersome." (Tr. 247).  Marvets emphasized that her back hurt "much more" than her legs (Tr. 247).  She stated that she could not lift anything, was unable to walk more than a few steps at a time, and could not sit or stand more than 10 minutes (Tr. 247-248).  Marvets also indicated that she "never sleeps well; [has] [p]aresthesia a little of the time . . . night pain and progressive muscle weakness." (Tr. 248).  Dr. Haft performed a physical exam[4] and reviewed AP and lateral flexion/extension views of her lumbar spine (Tr. 249).  Dr. Haft noted,

> She has some mild degenerative changes with disc space
> narrowing in the lumbar spine.  At L3-4 she has approximately
> 12 degrees of relative motion at the disc space between flexion
> and extension views.  There is no degenerative scoliosis seen
> on the AP view.  No pars defects or spondylothesis are seen
> on the lateral views.

(Tr. 249)

---

[4]  Dr. Mendoza noted in his exam notes,
> She is able to stand and walk to the door smoothly with no
> limp.  She is able to rise on her toes and take a few steps on
> her heels, but has trouble sustaining this.  Similarly with heels.
> She has very limited forward flexion at the waist with
> fingertips to the mid thigh.  This causes significant low back
> pain.  She also has only about 5 degrees of active extension,
> which also causes some low back pain.  She is moderately
> tender to palpation in the paraspinous musculature of the low
> back.  Manual motor testing shows 5/5 strength throughout
> both lower extremities.

(Tr. 249).

Dr. Sergio A. Mendoza reviewed and affirmed Dr. Haft's findings (Tr. 250). Drs. Haft and Mendoza noted,

> Ms. Marvets' lumbar spine shows a hypermobility pattern. She is in very bad physical conditions. We have talked her into having a rehab evaluation and a plan for a multidisciplinary rehab program.[5] We think that a range of motion and muscle toning conditioning of her trunk musculature may be able to control her symptoms adequately.

(Tr. 250).

On July 15, 2002 Marvets indicated to ARNP Douglas that her medication was "not really doing anything" to help with her feelings of stress and depression (Tr. 390). On August 9, 2002 Dr. Glenn F. Haban performed a psychological evaluation of Marvets (Tr. 242). Dr. Haban found Marvets "functioning within the normal range for orientation and elemental cognitive capacity." (Tr. 244). Dr. Haban noted,

> Emotionally, Ms. Marvets describes her status as a 'wreck.' She felt depressed almost every day for the past 3-4 months. She feels depressed because she is not able to work, her identity was stolen, and health worries. She complains of having low energy and is pessimistic towards the future. She has been prescribed medication by her physician and receive counseling by a social worker, but states that this does not help. She reports difficulty with sleep onset and maintenance due to her pain. She estimates that she is able to sleep only about 2 hours at a time.

(Tr. 243). He found that Marvets' mental status examination was "suggestive of an adjustment disorder[6] and pain disorder"[7] and assessed her GAF at 65 (Tr. 244).

---

[5] Dr. Haft noted that they did "not feel that her symptoms and history are consistent with spinal stenosis" and was "more likely due to deconditioning and muscle weakness." (Tr. 250).

[6] Dr. Haban listed this under Axis I as 309.28 Adjustment disorder with mixed anxiety and depressed mood.

[7] Dr. Haban listed this under Axis I as 307.89 Pain disorder associated with both

(continued...)

On September 9, 2002 ARNP Douglas saw Marvets for depression, weight management, and an increased productive cough (Tr. 387). Regarding depression, Marvets stated that she was much better and medication had helped (Tr. 387). ARNP Douglas noted that she had used her husband's nebulizer and her cough had gotten better (Tr. 387). Marvets had decreased her smoking to 3/4 of a pack, but had not been exercising (Tr. 387).

On August 19, 2002 Dr. John F. Tedesco completed a Psychiatric Review Technique assessment for Marvets. He found that she had a non-severe impairment under listing 12.04 Affective Disorders (Adjustment Disorder) (Tr. 303). Under "B" criteria, Dr. Tedesco determined that Marvets had mild limitations regarding activities of daily living, social functioning, and concentration (Tr. 313). He found that Marvets had no episodes of decompensation and no evidence of "C" criteria (Tr. 314). In his summary notes, Dr. Tedesco reviewed Dr. Haban's evaluation and noted Marvets' allegations of difficulty going out in public and general memory and motivation issues (Tr. 317). Dr. Tedesco noted,

> A few issues erode the credibility of the claimant's allegations. She initially did not allege any type of psychological limitations. She reported at the time of the CE that she is not presently looking for work and feels unable to work due to her physical conditions. She notes having been prescribed medication by her physician however this is not apparent in chart notes. Dr. Haben did not feel the claimant is restricted by her MDI. This opinion is consistent with the overall evidence, and is reflected on the attached PRT.

(Tr. 317).

On October 10, 2002 ARNP Douglas saw Marvets for heartburn symptoms and right arm pain (Tr. 383). On October 22, 2002 ARNP Douglas saw Marvets for follow-up for GI symptoms (Tr. 382). ARNP Douglas noted that she was still having problems with

---

[7](...continued)
psychological factors and a general medical condition.

pain in her right arm (Tr. 382). ARNP Douglas also prescribed Marvets an oxygen machine to treat her emphysema (Tr. 382). On November 6, 2002, ARNP Douglas noted that Marvets was making "good lifestyle changes," i.e., she had decreased her smoking to a half pack per day, was doing well on her diet, and was "up to walking up to 3 blocks a day." (Tr. 381).

On November 22, 2002 ARNP Sara Douglas saw Marvets for lower back pain and right arm pain (Tr. 379). ARNP Sara Douglas noted that she normally "takes Advil and Tylenol which is not working at all for her." (Tr. 379). She further noted that Marvets "has been evaluated in Iowa City for back pain and she told me that all they recommended was physical therapy and she was to come down there for two weeks for a program but [she] cannot do that because she has to be at home to take care of her 9 year old granddaughter who has some severe mental health problems." (Tr. 379). ARNP Douglas prescribed Vicodin and referred her to physical therapy (Tr. 379).

On February 10, 2003 ARNP Sara Douglas followed up with Marvets "for chronic illnesses which are hyperlipidimia, emphysema, and GERD." (Tr. 376).

> Patient states that she does have trouble breathing at night. She gets shortness of breath when she tries to turn in bed or get up. The respiratory people did do overnight pulse oximetry. She did drop to 82% at night on room air.
>
> * * *
>
> She is complaining of swelling in her legs still during the day. She is trying to exercise more. She is doing aquasize (sic) two times during the week. She is trying to quit smoking, she is down to ½ pack a day. She stated that she has her hypnosis tapes again. She had done that previously and they seem to work for her. She states that her stress levels are down. The Wellbutrin seems to be working well for her stress and depression. She has GERD. She seems to be well controlled with the Nexium.

(Tr. 376). ARNP Douglas noted that she would send Marvets for pulmonary functions tests and a chest X-ray and that Marvets would continue with physical therapy for chronic back pain (Tr. 376).

On February 24, 2003 ARNP Sara Douglas met with Marvets regarding increased shortness of breath with exertion (Tr. 374). Marvets indicated that she gets "winded" when she goes to the store (Tr. 374). She stated that she was trying to quit smoking and exercise as she felt her weight contributed to her breathing problems (Tr. 374). ARNP Douglas told Marvets to choose between her inhalers and try to cut down on her use of nebulizers, noting that "[s]he may actually be doing a little too much of the breathing medication." (Tr. 374). On March 31, 2003 ARNP Sara Douglas noted that Marvets was "wearing oxygen (sic) at night and says that does seem to help, she wears it just occasionally during the day when she feels a little short of breath."(Tr. 372).

On August 1, 2003 Marvets went to the Covenant Medical Center Emergency Department due to a 5-10 second loss of vision in her right eye (Tr. 360). By the time she reached the Center, her symptoms had almost completely resolved except for a "slight headache behind her right eye" and feeling "a bit achy throughout her entire body." (Tr. 360). Dr. Todd K. Lawrence indicated that she should call Dr. Mutchler and set up an echocardiogram (Tr. 360).

On January 21, 2004 Dr. Gary A. Knudson evaluated Marvets upon referral from Dr. Mutchler (Tr. 330). Dr. Knudson examined her and reviewed her medical records (Tr. 330). He noted that she "ambulates with a mildly antalgic gait on the left, somewhat stiff-kneed, slightly bent spine." (Tr. 330). Upon review of Marvets' X-rays, Dr. Knudson noted that her left knee showed some mild degenerative changes and a central medial meniscus tear (Tr. 330). He noted that "[s]he is overweight and would certainly benefit from weight loss, physical therapy and activity modification. At this point, however, given symptoms and signs for meniscal pathology, arthroscopic evaluation may be the best option." (Tr. 330). Dr. Knudson noted that Marvets wished to proceed with surgery as outlined (Tr. 330).

On February 2, 2004 Dr. Mutchler prepared Marvets for knee surgery and performed a physical exam (Tr. 348). Dr. Knudson then performed the procedure (Tr. 350). On February 26, 2004 Dr. Udaya Shreesha conducted a sleep study for Marvets upon referral from Dr. Mutchler regarding reported daytime sleepiness (Tr. 343). Dr. Shreesha detected "[n]o evidence of obstructive sleep apnea" and noted that Marvets "might benefit from obtaining multiple sleep latency tests to confirm that she has excessive daytime sleepiness." (Tr. 343). The technician notes indicated that Marvets experienced leg movements and some associated arousals (Tr. 346).

B. Plaintiff's Subjective Complaints

On her February 20, 2002 Disability Report, Marvets indicated that her extreme obesity, arthritis in her back, bulging disks, hip/shoulder/knee problems limited her ability to work (Tr. 133). She stated that she stopped working "[b]ecause of severe back pain and by shoulder (sic) and knee and back would lock up and I can hardly walk-sleep-sit, stand etc." (Tr. 133).

On March 26, 2002 Marvets filled out a Personal Pain/Fatigue Questionnaire (Tr. 146). She described her pain as constant, sharp, stabbing, and aching (Tr. 146). Movement and weather both increase her pain (Tr. 145). She indicated that the pain is always in her back, hips and shoulder and (Tr. 146). Marvets noted that she had to restrict her activities, i.e., walking, playing with grandchildren, sewing, quilting (Tr. 147). Regarding sleep, Marvets averages 2-4 hours of sleep per night "due to the pain of just laying down or getting up because of back, hips, [and] legs." (Tr. 148). As a result of her pain, Marvets states that she has less patience and tolerance with her friends/family (Tr. 148). She takes longer to bathe and dress (Tr. 148). Marvets can lift under 5 lbs. and has difficulty picking up small items (Tr. 148). She notes that she has difficulty walking, standing, and sitting (Tr. 149).

On her June 12, 2002 Reconsideration Disability Report Marvets stated that since filing her claim, she began receiving treatment for depression with nervous disorder, her back pain worsened, and she is seeking treatment for a lump in her left breast (Tr. 154).

11

She noted that she was unable to remain calm, focus, and motivated; she often had "worthlessness feelings and want[s] to give up due to pain and discomfort." (Tr. 154).

On July 23, 2002 Marvets' friend Raelynn Porter filled out a Third Party Daily Activities Questionnaire (Tr. 161). Ms. Porter had known Marvets for 3 years and saw her 3 to 4 times a week (Tr. 161). Regarding sleep, Ms. Porter noted that Marvets "doesn't sleep for normal lengths of time [and] moves around a lot from discomfort and pain in her back and knees." (Tr. 161). When completing chores, she notes that Marvets 'becomes tired and in pain quickly." (Tr. 162). She also noticed "mood swings and severe lack of motivation." (Tr. 162). Ms. Porter indicated that Marvets usually prepared simple meals, i.e., hot dogs or Ramen noodles (Tr. 162). Marvets also went shopping with others in order to have help carrying her shopping bags (Tr. 162).

Regarding interests, Ms. Porter noted that Marvets uses her computer "when her back does not hurt in the computer chair." (Tr. 163). She enjoyed television and radio (Tr. 163). Regarding social functioning, Marvets visited with whomever comes to see her, but rarely became involved socially otherwise (Tr. 163). She noted that Marvets became "very emotional and down on herself" when criticized (Tr. 163). Regarding concentration and focus, Ms. Porter stated that when under stress Marvets became depressed and lost focus and motivation easily (Tr. 164). She noted that Marvets "used to be a fairly stable person [but Ms. Porter has] noticed a lot of ups and downs recently." (Tr. 1564).

On July 12, 2002 Marvets filled out a Personal Pain/Fatigue Questionnaire (Tr. 166). She described the nature and location of her pain much as in her previous questionnaire (Tr. 166). She also noted that she also uses inhalers to assist with chronic emphysema (Tr. 166). Marvets also listed similar restrictions and limitations as outlined previously (Tr. 168).

On July 23, 2002 Marvets filled out a Daily Activities Questionnaire (Tr. 169). She described poor sleeping habits (Tr. 169). Due to pain, she stood for only short periods of time and cooked meals that require little preparation (Tr. 170). Friends helped her carry her bags when shopping and also helped her put them away (Tr. 170). She took

care of a nine year old dependent and pets (Tr. 170). She noted that some of her medications caused "mood swings, drowsiness, depression, sleeping [problems], and unclear thinking." (Tr. 170). Regarding interests, she used the computer, watched television, and listened to the radio." (Tr. 171).

Regarding social functioning, Marvets socialized with those who visit her in her home and only sometimes went out in public (Tr. 171). She did not participate in family or social gatherings (Tr. 171). Regarding concentration and focus, Marvets noted that she has problems with her memory generally and disliked change (Tr. 172). She reacted to stress by keeping her anger in and becoming depressed (Tr. 172).

## C. Competing RFCs

On August 9, 2002 Dr. Haban completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) regarding Marvets (Tr. 245). Dr. Haban noted that neither Marvets' ability to understand, remember, and carry out instructions nor her ability to respond appropriately to supervision, co-workers, and work pressure in a work setting was affected by her mental impairment (Tr. 245-246).

On May 3, 2002 Dr. Dennis A. Weis found that Marvets could occasionally lift 20 lbs., frequently lift 10 lbs., stand and/or walk for about 6 hours in an 8-hour workday, and sit (with normal breaks) for about 6 hours in an 8-hour workday (Tr. 320). She may push and/or pull without limits, other than limits shown as to lifting and carrying items (Tr. 320). Marvets may occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 321). Dr. Weis found no manipulative, visual, communicative, or environmental limitations (Tr. 322-324). In his summary, Dr. Weis noted that Marvets complained of pain and fatigue, but "[d]espite this takes only over the counter Advil." (Tr. 327). Dr. Weis noted that he adjusted his RFC determination to reflect that "[r]ecord review finds a paucity of evidence"[8] to support her subjective allegations and that "[t]here are a

---

[8] Dr. Weis' summary notes indicate as follows,
    [Marvets] was apparently seen on a single occasion by

(continued...)

number of inconsistencies which erode her credibility."[9]  On September 27, 2002 Dr. John May affirmed Dr. Weis' assessment (Tr. 318).

> On reconsideration the claimant states her symptoms are worse.  Biopsy of breast lump reveals no evidence of malignancy.  No reported evidence of significant pulmonary problems reported on physical exam.  Her weight has not changed significantly and still has BMI of 44.36.  Exam at UIH revealed restriction of motion of lumbar spine without evidence of radiculopathy and no loss of strength.  Although claimant states she has a limp, no limp was noted on exam.  Conditioning was recommended.

---

[8] (...continued)

> Dr. Johnson for evaluation of her back pain.  She had suffered a previous contusion to the right knee but indicated in 1/11/2002 that she had recovered from that.  X-rays of the lumbosacral spine 1/14/2002 was negative.  A CT showed mild bulging at L2-3 and mild spondylolysis at L5.  Her motor and neurological exams however are entirely intact.  She has not otherwise sought or received medical attention for any of her orthopedic conditions.  X-rays of her hands showed only some very mild degenerative changes.  No abnormality in function has been noted in that regard.  The claimant has a history as well as some GE reflux disease but no evidence of GI complications or malnutrition and in fact she is noted to be obese.  She is around 5' tall and weights in file find her approximately 254 pounds--she states she is 300 pounds.  X-ray of her right knee 12/27/2007 is normal.

(Tr. 327).

[9] Specifically, Dr. Weis notes,

> There is no documentation of impairment related to hands, hip, knees or shoulder problems and she has only mild degenerative changes in her lumbosacral spine.  She is in fact (sic) sought medical attention on a single occasion alone for that condition and has no evidence of motor or neurologic defects.  In addition to this she takes only over the counter Advil for her pain.  Treating source's and examining source's (sic) do not make specific recommendations regarding her residual functional capacity.

> Her allegations are unchanged, but has some reported shortness of breath with exertion noted at UIH evaluation, but no marked limitations in activity due to this impairment. She is noted to be continuing her cigarette smoking. Inconsistencies are present within the file as previously noted in the previous exam.

(Tr. 318).

On June 24, 2004 Dr. Mutchler completed a Pulmonary Residual Functional Capacity Questionnaire for Marvets.(Tr. 438). Dr. Mutchler diagnosed her with COPD, TIAs, restless leg syndrome, depression, arthralgias myalgias, and asthma (Tr. 438). He identified Marvets' symptoms as shortness of breath, chest tightness, wheezing, episodic acute asthma, episodic acute bronchitis, fatigue, palpitations, and coughing (Tr. 438). Precipitating factors included upper respiratory infection, exercise, emotional upset/stress, irritants, and cold weather or changes in weather (Tr. 439). Dr. Mutchler characterized her attacks as "severe shortness of breathe, uses Nebulizer 4x day and inhalers, [and] uses oxygen." (Tr. 439). He noted that she had asthma attacks 2 to 3 times a month and during each incident became incapacitated from 15 minutes up to 5 hours (Tr. 439). Dr. Mutchler stated that she was not a malingerer and emotional factors contributed to the severity of her symptoms and functional limitations (Tr. 439). He stated that her symptoms were constantly severe enough to interfere with the attention and concentration needed to perform even simple work tasks (Tr. 439). Dr. Mutchler determined that Marvets was incapable of even "low stress" jobs due to her inability to function with stress (Tr. 439). He noted that she had no side effects from her medications (Tr. 440).

Dr. Mutchler determined Marvets' functional limitations as follows: able to walk ½ block without rest or severe pain; sit for 15 minutes; stand for 15 minutes; sit and stand/walk for less than 2 hours total in an 8-hour working day; and needed to take unscheduled breaks every 10 to 15 minutes with between half an hour to 45 minutes of lying down at rest (Tr. 440-441). She could never lift and carry items of any weight during a competitive work situation; rarely twist, stoop, and crouch/squat; and never climb ladders or stairs (Tr. 441). Dr. Mutchler indicated that Marvets should avoid even

moderate exposure to: extreme cold and heat; high humidity; wetness; perfumes; soldering fluxes; solvents/cleaners; fumes, odors, gases; dust; and chemicals (Tr. 441). However, Dr. Mutchler indicated that Marvets should have no restrictions regarding cigarette smoke (Tr. 441). He noted that Marvets' impairments are likely to produce "good days" and "bad days." (Tr. 441). Lastly, when asked how many days per month that Marvets would likely be absent, Dr. Mutchler wrote in "unable to work." (Tr. 442).

## D. Hearing Testimony

The ALJ held Marvets' hearing on August 18, 2004.[10] Marvets appeared in person with her attorney Jeffrey Berg. The ALJ heard testimony from Marvets, Ronald Marvets, and vocational expert George Paprocki. At the time of the hearing, Marvets was 54 years old (Tr. 43). Marvets claimed disability as of December 26, 2001 (Tr. 45). Since her disability onset date, Marvets had worked as a home care aide and then as a county worker who taught parenting skills and supervised parental visits with children (Tr. 45). She indicated that she stopped working due to the physical nature of her job, i.e., lifting children in car seats (Tr. 45). Previously, Marvets worked as a shaving hauler for nine and a half years and then worked in home care (Tr. 46). As a home care aide, she frequently lifted patients weighing up to 310 lbs. during the course of care (Tr. 46). When asked why she could not work at the present, Marvets indicated "shortness of breath and I'm on the oxygen at night." (Tr. 47). She also stated that she used a nebulizer four times a day and recently started using a TENS unit (Tr. 47-48). Marvets testified that her breathing difficulties have progressively worsened since her onset date (Tr. 48). She noted that she could not walk for long periods of time and had to do housework in shifts (Tr. 50, 59). Moist air helped her breathe more easily, however damp cold air made breathing more difficult (Tr. 50).

---

[10] Marvets originally had a hearing scheduled on April 20, 2004 and appeared pro se. The ALJ informed MarMarvets that she may postpone her hearing in order to acquire a lawyer. Marvets decided to seek a lawyer and the hearing was postponed.

Marvets noted that she recently had undergone knee surgery, but still received cortisone treatments as "it's apparently not working as well as it should." (Tr. 51). Her right knee also hurt, but to a lesser degree than her left knee (Tr. 52). In addition to knee pain, she stated that she had degenerative arthritis in her back and hips and tendinitis in her right wrists and forearms (Tr. 52). Marvets described her cumulative pain as a 9 out of 10 (Tr. 52). To deal with the pain, she used a TENS unit and took Percocet, Neurontin, and Vioxx (Tr. 53). She did not notice any side effects from her medication (Tr. 53). When asked how her cumulative pain affected her, beyond the need to shift positions, Marvets stated:

> Well, between shifting positions and I stiffen up (sic), and then my legs and outer hip go[] to sleep or get a numbness and sometimes it just buckles up or locks up and I just can't, sometimes if I'm laying down, I can't get up without assistance. Or sometimes if I'm walking, I've got to stop dead because I can't, it won't maneuver to, it just kind of, my left side just kind of drags at times.

(Tr. 53). Marvets noted that she sometimes fell and had to be assisted to her feet (Tr. 54). She purchased a cane to aid in walking after her knee surgery (Tr. 54).

When asked about mental health treatment, Marvets noted that she had sought help for stress and that she had been feeling anxious, nervous, and overwhelmed (Tr. 55). She noted that,

> [T]his [ha]s been ongoing for 10 or 12 years and I just thought I could do it on my own and handle it. And then just recently, everything just seemed to be bombarding me. The pain everyday, you know, the stiffness and getting up and moving and what have you. And then just plain stress.

(Tr. 55).

She takes anti-depressants, sees a counselor every other week, and sees a psychiatrist one a month (Tr. 56). She noted that the treatment was intended to help her deal with stress

and that her doctor thought she had "obsessions."[11]   Marvets slept for an average of 3 to

4 hours a day to escape depression (Tr. 57).  However, she would wake up during the night

unable to fall back asleep (Tr. 57).  Marvets indicated that she was not suicidal (Tr. 58).

Marvets took medication for gastric reflux and noted that she had gained weight over

the previous 2 to 3 years due to overeating in response to depression (Tr. 58).  At the time

of the hearing she was between 5'2" and 5'3" and weighed 256 lbs (Tr. 59).  She noted that

her weight had fluctuated between 310 and 250 lbs (Tr. 59).  When asked how her weight

alone, separate from her pain, affected her ability to move, Marvets stated, "Well, it's

obvious the more weight you carry, and I'm sure the more out of breath that I get."

(Tr. 59).  When asked about her attempts to lose weight, she noted that visiting a

nutritionist had helped her learn the right methods of cooking, but "the weight [wa]s not

coming off." (Tr. 59).

---

[11]   When asked about her obsessions, Marvets explained,

> With a person named Barb and Net which is a little guy that I
> used to, come over and watch for about an hour every other
> week or so why (sic) his mom ran to do an errand or
> something and in return she would go to the grocery store for
> me.  And I hadn't seen or heard from them for a long time and
> she had a great deal of money on her and was going to
> Maryland and she never came back.  And when she came
> back, I thought that I would hear from her, and I didn't.  So
> I got excitable thinking maybe she was dead along the road or
> something.  Somebody knocked her out, took her money.  I
> called the Maryland police and they tried to track her down,
> and what have you.  And the psychiatrist decided that they
> thought maybe that was a little obsessive.

(Tr. 56).

The ALJ questioned Marvets about transient ischemic attacks[12] (TIAs). She testified that she had "had them several times in the past, probably six or eight years and the last one was in September of last year." (Tr. 65). Marvets noted that she went to the hospital after each attack, with the most recent TIA causing her to go blind temporarily (Tr. 65). She also testified that she was diagnosed with restless leg syndrome during a sleep study (Tr. 66).

Marvets noted that she could walk approximately half a block before her knee would start to ache with stabbing pains and she would be out of breath (Tr. 66). She could stand for 10 to 15 minutes and could be on her feet for 2 to 3 hours of an 8 hour work day (Tr. 66). Climbing stairs raised problems for Marvets as it caused leg and hip pain, strained her back, and affected her breathing (Tr. 67). She also noted that she had problems bending over from the waist and also had permanent restrictions regarding stooping, squatting, repetitive actions with her arms due to a car accident in 1991 (Tr. 67). Marvets stated that she was not supposed to lift more than 5 lbs. above or below her waist (Tr. 67). When the ALJ noted that she has worked at jobs requiring her to lift up to 310 lbs. since 1991, Marvets stated,

> That's correct. But that was later on, and they
> didn't have a job that I could do, and I needed a
> job that I could do, and I needed a job, I have to

---

[12]
Sometimes called a "mini-stroke,"
[A TIA] occurs when the blood supply to part of the brain is briefly interrupted. TIA symptoms, which usually occur suddenly, are similar to those of stroke but do not last as long. Most symptoms of a TIA disappear within an hour, although they may persist for up to 24 hours. Symptoms can include: numbness or weakness in the face, arm, or leg, especially on one side of the body; confusion or difficulty in talking or understanding speech; trouble seeing in one or both eyes; and difficulty with walking, dizziness, or loss of balance and coordination.

See http://www.ninds.nih.gov/disorders/tia/tia.htm

> have money.  So I therefore had to do what I had
> to do.

(Tr. 67).  Marvets further stated that she that when she tries to kneel or crawl that she experiences something similar to electrical shocks in her knee and back pain (Tr. 67).  She noted that she wears a brace for her tendonitis and eventually may undergo surgery if it worsens (Tr. 68).  Marvets noted that she has trouble gripping items and drops them frequently (Tr. 68).  She stated that her fingers swell for approximately an hour after she wakes in the morning and she has trouble lifting a load of laundry (Tr. 68).  She could sit for 15 to 20 minutes, and then must shift in the chair or walk around (Tr. 68).  Marvets stated that she had trouble vacuuming due to the difficulty of pushing and pulling (Tr. 69).

Regarding concentration, Marvets stated that she sometimes had difficulty remembering things and understanding things such as directions or time sequence, but did not think that she has trouble focusing (Tr. 69).  She noted that fumes, aerosol, perfumes, deodorants, dust, and mold affect her breathing (Tr. 70).  She also acknowledged that she smokes approximately a pack of cigarettes a day (Tr. 70).

Regarding everyday activities, Marvets stated that she has difficulty dressing when trying to pull clothes over her head or tying her shoes (Tr. 71).  She does the dishes after breakfast and then does "a lot of sitting and wondering in the house and lying down." (Tr. 72).  Marvets stated that prior to her disability onset she used to enjoy camping, canoeing, reading, and hiking (Tr. 72).

Ronald Marvets, her husband, testified that she forgets things and must lay down for naps every day (Tr. 73).  He also noted that she "can't even hardly vacuum the house anymore (Tr. 74).  Mr. Marvets stated that he now made their 11-year-old "granddaughter"[13] help with the dishes, vacuuming, and laundry." (Tr. 74).  He said that his wife couldn't carry the laundry up and down the stairs to the basement (Tr. 74).

---

[13]  Mr. Marvets noted that she is not their actual granddaughter, however they have legal custody of her.

Mr. Marvets noted that on long car trips they have to stop frequently in order to "let her walk around or she gets stiff and she can't move and I've got to help her out."[14] (Tr. 75).

George Paprocki, the vocational expert (hereinafter "VE"), next presented testimony to the ALJ. After reviewing his qualifications, the ALJ posed the following hypothetical:

> My assumption is that we have an individual who is 54 years old. She was 55 years old (sic) as of the alleged onset date of disability. She's a female. She has a high school General Equivalency Diploma. Plus she has completed training as a certified nurse aide at Hawkeye Community College. She has past relevant work as you've indicated in Exhibit 20E. And she has the following impairments: She has sponding moleases (phonetic) and degenerative disc disease of the fifth lumbar level, with degenerative changes of the left knee. With a history of meniscus tear and recent surgery. She has hypertension, obesity, gastric safaga reflux disease, a history of carpel (sic) tunnel syndrome surgery and trigger thumb surgery. With a recent history of tendinitis of the right upper extremity. A history of transient ecimule (sic) attacks. History of restless leg syndrome. She has an adjustment disorder with mixed anxiety and depressed moods and chronic obstructive disorder or disease. And as a result of a combination of those impairments, she has residual functional capacity as follows.
>
> She cannot lift more than 20 pounds, routinely lift 10 pounds. With standing of one hour at a time. With standing and walking six hours out of an eight hour day. With only occasional bending, stooping, squatting, kneeling, crawling or climbing. This individual should not be exposed to excessive heat, humidity or cold. Would this individual be able to perform any jobs she previously worked at either as she performed [it] or as it is generally performed within the national economy, and if so, would you please specify which job?

---

[14] He also noted that they stopped 4 times on the way to the hearing.

(Tr. 80).  The VE stated that "[t]he work she did in the past was more exertional than the hypothetical would allow.  At the 20 and 20 limits [the ALJ] indicated, we're talking about light exertion as a maximum." (Tr. 80).

The ALJ then asked if there were any skills acquired by Marvets which she should be expected to transfer to other work within the limitations of this hypothesis (Tr. 81).  The VE noted that Marvets' past experience working with the general public indicates that she is "able to code things." (Tr. 81).  The VE then assumed that "because of the specific training she had, also able to utilize things, specific medical equipment such as a blood pressure cup" and thus opined that Marvets could transfer skills to alternative jobs (Tr. 81).  When asked to identify a sampling of the type of jobs to which such skills would transfer and their existence within the national economy, the VE responded that she could do the work of a ward clerk,[15] receptionist,[16] and companion[17] (Tr. 81).

The ALJ then proposed a second hypothetical,

> My next hypothetical would be an individual at the same age, sex, education, past relevant work and impairments as previously specified.  And this would be an individual who would have the residual functional capacity as follows.  This individuals could not lift more than five to ten pounds.  She could not stand for more than 10 to 15 minutes at a time, or walk for more than a half block at a time.  With standing or walking of two to three hours out of an eight hour day.  She can only sit for one-half to three-quarters hour at a time in six out of eight hours.  With only occasional bending, stooping, squatting or climbing.  No kneeling or crawling.  Only occasional pushing or pulling.  Only occasional gripping with the right hand which is the major upper extremity.  This

---

[15]  The VE stated that about 500 jobs existed statewide and approximately 25, 000 jobs existed nationally.

[16]  The VE stated that about 10,000 jobs existed statewide and approximately 500,000 jobs existed nationally.

[17]  The VE stated that about 500 jobs existed statewide and approximately 75,000 jobs existed nationally.

> individual should not be exposed to excessive cold or dampness
> or more than minimal amounts of dust or fumes.  She is not
> able to do very complex or technical work, but is able to do
> more than simple routine, repetitive work.  She should not
> work at more than a regular pace or more than a mild level of
> stress.  I assume this individual cannot return to past relevant
> work.  Is that correct?

(Tr. 82).  The VE agreed (Tr. 82).  The ALJ then asked whether such an individual would
be able to transfer acquired  skills to other work (Tr. 82).  The VE responded that the only
job he could suggest would be that of a surveillance monitor (Tr. 82).  The ALJ then asked
whether additional factors should be included in the hypothetical which were not previously
mentioned (Tr. 83).  The VE noted,

> Mention was made of the claimant's forgetfulness.  After a
> certain point, that would be a factor in being able to hold
> employment.  The inability to stay on task, even for work
> which is fairly simple and repetitive in nature, would probably
> result in an individual not being able to maintain employment.

(Tr. 83).

Marvets' attorney questioned the VE as well.  The VE noted that the need to take
frequent unscheduled rest breaks for half an hour to forty five minutes at a time to lie down
would preclude competitive employment (Tr. 85).  He also stated that absences of four days
or more  would also do so (Tr. 85).  When asked whether constant pain severe enough to
maintain attention/concentration would preclude employment, the VE agreed that it would
(Tr. 85).

### III.  CONCLUSIONS OF LAW

#### A.  Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be
supported by substantial evidence appearing in the record as a whole.  See Lochner v.
Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th
Cir. 1989).  Substantial evidence is more than a mere scintilla.  It means relevant evidence
a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales,

402 U.S. 389, 401 (1997); <u>Cruse</u>, 867 F.2d at 1184; <u>Taylor v. Bowen</u>, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence that fairly detracts from the ALJ's findings. <u>Cruse</u>, 867 F.2d at 1184; <u>Hall v. Bowen</u>, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." <u>Cruse</u>, 867 F.2d at 1184 (quoting <u>Consolo v. Fed. Mar. Comm'n</u>, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. <u>Gunnels v. Bowen</u>, 867 F.2d 1121, 1124 (8th Cir. 1989); <u>Gavin v. Heckler</u>, 811 F.2d 1195, 1199 (8th Cir. 1987).

## B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation. <u>See</u> 20 C.F.R. § 404.1520(a)–(f); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The five steps are:

(1)     If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)     If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3)     If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)     If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

<blockquote>
(5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.
</blockquote>

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the analysis, the ALJ found Marvets had not engaged in substantial gainful activity since her alleged onset date (Tr. 17). At the second step, the ALJ determined that Marvets has the following severe impairments:

<blockquote>
degenerative disc and joint disease in the lumbar spine; a left knee disorder, status post arthroscopy with partial medial menisectomy and lateral tibial condial abrasion chrondoplasty in February 2004; is obese at 65" tall with a weight of approximately 258 pounds; has chronic obstructive pulmonary disease; gastric problems; history of carpal tunnel surgery and trigger thumb surgery and recent tendonitis of the right upper extremity; history of transient ischemic attacks, [and] adjustment disorder with mixed anxiety and depression.
</blockquote>

(Tr. 18). At the third step, the ALJ determined that Marvets' impairments did not meet or equal one of the listed impairments (Tr. 18). At the fourth step, the ALJ determined that Marvets was unable to perform her past relevant work. At the fifth step, the ALJ found that Marvets could transfer acquired skills to perform jobs such as ward clerk, receptionist, and companion and therefore is not disabled (Tr.22).

<u>C.  Residual Functional Capacity</u>

Marvets argues that the ALJ failed to incorporate her functional limitations when determining her RFC.  Specifically, Marvets asserts that the ALJ improperly discounted the opinion of her treating physician regarding work-related limitations and the ALJ should have considered her obesity according to SSR 02-1p.  As such, Marvets asserts that the ALJ presented an improper hypothetical to the VE.  In response, the Commissioner states substantial evidence supports the ALJ's RFC assessment and that the ALJ adequately considered Marvets' obesity when calculating her RFC.

Determining a claimant's residual functional capacity is a medical question.  <u>Lauer v. Apfel</u>, 245 F.3d 700 (8th Cir. 2001); <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000).  "The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  <u>McGivney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000) (citing <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995)).  However, the record "must include some medical evidence that supports the ALJ's residual functional capacity finding."  <u>Dykes v. Apfel</u>, 223 F.3d 865, 867 (8th Cir. 2000) (citing <u>Anderson</u>, 51 F.3d at 779); <u>Lauer</u>, 245 F.3d at 704 (noting that while the ALJ was not "limited to considering medical evidence," the ALJ was "required to consider at least some supporting evidence from a professional").

"The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole."  <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000).  Further, an ALJ "may not draw upon his own inferences from medical reports."  <u>Lund v. Weinberger</u>, 520 F.2d 782, 785 (8th Cir. 1975).  "If the ALJ did not believe, moreover, that the professional opinions available to him were sufficient to allow him to form an opinion, he should have further developed the record to determine, based on substantial evidence, the degree to which [the claimant's] mental impairments limited his ability to engage in work-related activities."  <u>Lauer</u>, 245 F.3d at 706 (citing <u>Nevland</u>, 204 F.3d at 858; 20 C.F.R. § 404.1519a(b)).

## 1. Treating Physician

Marvets asserts that the ALJ failed to give specific and legitimate reasons for rejecting the opinion of her treating physician, Dr. Bryant Mutchler, as to her limitations due to asthma and pulmonary problems. The Commissioner responds that the ALJ properly discredited Dr. Mutchler's opinion because Dr. Mutchler did not actually treat Marvets for her breathing impairments, and thus was not a treating source, and objective medical evidence does not support Dr. Mutchler's RFC assessment. Def. Brief, p. 13.

The ALJ gave no weight to Dr. Mutchler's opinion because he found it "inconsistent with the record as a whole" and did "not meet any of the criteria of 20 C.F.R. §§ 404.1527(d) or 416.927(d)." The ALJ analyzed the record as follows:

> In his treatment records there are no clinical findings or laboratory studies that would support any degree of limitation as opined by Dr. Mutchler in the residual functional capacity Questionnaire in Exhibit 16F. In fact some of the diagnoses such as transient ischemic attacks and restless leg syndrome are noted only historically and are not identified by underlying objective findings. There is also a sleep study conducted in February 2004 and identified in Exhibit 13F which demonstrates that claimant does not have sleep apnea. The undersigned finds that restless leg syndrome would be demonstrated in such a study and it was not mentioned. The record does not show that this doctor treated this claimant for chronic obstructive pulmonary disease, asthma or emphysema. Accordingly, the undersigned does not find Dr. Mutchler to be a treating source for all the impairments indicted in the checklist. Moreover, since the record includes a pulmonary function study indicating only a mild degree of obstructive impairment with the diffusing capacity minimally decreased as indicated in Exhibit 14F, Dr. Mutchler's opinion is not consistent with the record as a whole.

(Tr. 19-20).

The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. <u>See</u> 20 C.F.R. § 404.1527(d)(2). When determining the proper weight,

> A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement. Piepgras v. Chater, 76 F.3d 223, 236 (8th Cir. 1996). See also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements).

The ALJ properly found that Dr. Mutchler's opinion lacked record support. Even taking into account the treatment Marvets received from ARNP Douglas, ARNP Douglas noted that Marvets used her oxygen machine "only occasionally during the day when she feels a little short of breath." (Tr. 372). She also indicated that Marvets may have been overusing the nebulizers (Tr. 374). ARNP Douglas' treatment notes do not support the limitations asserted by Dr. Mutchler in his RFC determination. The court will not disturb the ALJ's findings on this ground.

### 2. Obesity Analysis

Marvets asserts that the ALJ "failed to consider the functional limitations of [her] obesity in combination with her other impairments, as required by SSR 02-1p." Pl. Brief, p. 12). She notes that her BMI was approximately 42.9 at the hearing and that she has been "extremely obese" at all relevant times (Pl. Brief, p. 21). The Commissioner argues that

by including obesity in his hypothetical to the VE, the ALJ "sufficiently" considered Marvets' obesity.  Defendant brief, p.16) citing <u>Brown ex rel. Williams v. Barnhart</u>, 388 F.3d 1150 (8th Cir. 2004) (court finds the ALJ sufficiently considered claimant's obesity where "[t]he ALJ specifically referred to [claimant]'s obesity in evaluating his claim." <u>Id.</u> at 1153).

According to SSR 02-01p, the ALJ should consider obesity when determining the following: (1) whether a claimant has a medically determinable impairment; (2) whether such an impairment is severe; (3) whether a severe impairment meets or equals a listed impairment; and (4) whether the impairment prevents the claimant "from doing past relevant work and other work that exists in significant numbers in the economy." SSR 02-01p.  SSR 02-01p explains how an ALJ should evaluate obesity when assessing RFC:

> Obesity can cause limitation of function.  The functions likely to be limited depend on many factors, including where the excess weight is carried.
>
> * * *
>
> The effects of obesity may not be obvious.  For example, some people with obesity also have sleep apnea.  This can lead to drowsiness and lack of mental clarity during the day.  Obesity may also affect an individual's social functioning.
> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time.
>
> * * *
>
> The combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.
>
> * * *

As with any other impairment, we will explain how we reached
our conclusions on whether obesity caused any physical or
mental limitations.

SSR 02-01p.

The ALJ did not specifically reference SSR 02-01p in his decision.  He noted that

Marvets was "obese at 65" tall with a weight of approximately 258 pounds" and found that

Marvets "neither allege[d] nor d[id] the record demonstrate that any listing level of severity

[wa]s met or equaled." (Tr. 18).  The ALJ further stated, "It is noted that claimant is

overweight and deconditioned but this does not provide an underlying basis for a finding

of disability in this case." (Tr. 21).

The SSR ruling describes the National Institute of Health's medical criteria for

determining obesity:

These guidelines classify overweight and obesity in adults
according to Body Mass Index(BMI).  BMI is the ratio of an
individual's weight in kilograms to the square of his or her
height in meters (kg/m2).  For adults, both men and women,
the Clinical Guidelines describe a BMI of 25-29.9 as
"overweight" and a BMI of 30.0 or above as "obesity."
The Clinical Guidelines recognize three levels of obesity.
Level I includes BMIs of 30.0-34.9.  Level II includes BMIs of
35.0-39.9.    Level III, termed "extreme" obesity and
representing the greatest risk for developing obesity-related
impairments, includes BMIs greater than or equal to 40.  These
levels describe the extent of obesity, but they do not correlate
with any specific degree of functional loss.

SSR 02-01p.

The court recognizes that the ALJ did not specifically cite to SSR 02-1p in his

decision.  However, the ALJ correctly noted that the record does not indicate that Marvets'

obesity alone supports a finding of disability (Tr. 21).  When asked how her weight affected

her limitations, Marvets testified, "Well, it's obvious the more weight you carry, and I'm

sure the more out of breath that I get." (Tr. 59).  As noted previously,  the record does not

support Dr. Mutchler's findings regarding Marvets' limitations due to COPD.  The court

finds that although the ALJ should have cited to SSR 02-1p in his decision, he properly found that the combination of Marvets' impairments, including obesity, did not support a finding of disability.

### 3. Credibility

The ALJ found Marvets' "testimony as to the severity of her impairments and attending symptoms not generally credible." (Tr. 22 ). This court requires the ALJ to utilize a full credibility analysis according to the dictates of <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). This analysis requires the following:

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.

<u>Id.</u>

This court has previously noted that "an ALJ is free to doubt a claimant's subjective pain complaints. However, he must support a denial of benefits based on a consideration of the above-mentioned five factors." <u>Barry v. Shalala</u>, 885 F. Supp. 1224, 1242 (N.D. Iowa 1995). Where an ALJ seriously considers but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

However, "a claimant need not prove that he or she is bedridden or completely helpless to be found disabled." <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989). <u>See also</u> <u>Keller v. Shalala</u>, 26 F.3d 856, 859 (8th Cir. 1994) (finding it error to discredit the claimant's subjective complaints of pain based on her daily activities which consisted of watching television, taking care of her dogs, and doing household chores, which claimant testified she could not do when she was suffering from a disabling headache); <u>Forehand v.</u>

Barnhart, 364 F.3d 984, 988 (8th Cir. 2004) (court examines whether claimant "has the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world") (internal citations omitted).

The ALJ began with examining Marvets' work record, noting that she had "a fair work record for the 1990s" but "her earnings record shows that she did work beyond her alleged onset date of disability." (Tr. 19). Regarding treating and examining physicians and third parties, the ALJ acknowledged Dr. Mutchler's pulmonary RFC but indicated that the RFC lacked clinical support (Tr. 19). The ALJ next reviewed Marvets' July 31, 2002 physical exam results, and other clinical findings (Tr. 20). The ALJ found the records "inconsistent with disability." (Tr. 20-21). The ALJ further noted that "[t]here are no indications that claimant has sustained any ongoing, significant, adverse side effects from medications." (Tr. 20-21). The ALJ emphasized that Marvets "continues to engage in a range of activity which she indicates is very reduced but which her doctors indicates should be increased by way of exercise to recondition herself." (Tr. 21). The ALJ concluded that "recommendations for exercise are absolutely inconsistent with claimant's allegation that she has a medical need to lie down." (Tr. 21). The court finds that the ALJ fully reviewed the record and analyzed Marvets' subjective allegations as required by Polaski. The court will not disturb the ALJ's credibility determination.

### 4. Improper Hypothetical Question

Marvets asserts that the ALJ improperly relied on the vocational expert's response to a hypothetical question that did not include all of his limitations. The Commissioner responds that the ALJ excluded from Marvets' RFC only those limitations which he found not credible or unsupported by the record as a whole.

An improper hypothetical cannot serve as substantial evidence. Whitmore v. Bowen, 785 F.2d 262, 263-64 (8th Cir. 1986). The hypothetical should precisely describe the claimant's impairments in order for the expert to properly evaluate the availability of jobs the claimant can perform. Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996).

However, the question need only include impairments supported by substantial evidence and not impairments rejected by the ALJ as untrue. See Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997). "Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) ("These assessments alone [of non-treating physicians] cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician."). Id. (citing Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991)); Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998) ("If a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability.").

As noted in the previous sections, the ALJ properly constructed Marvets' RFC and based his hypothetical upon her credible limitations. The court finds that the ALJ thus presented a proper hypothetical to the VE and will not disturb the ALJ's findings on this ground.

Upon the foregoing,

IT IS ORDERED that the determination of the ALJ is affirmed.

January 24, 2007.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT